# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

ERIC DAVID EDWARDS,

Plaintiff,

v.

RENAISSANCE NEIGHBORHOOD DEVELOPMENT CORPORATION; VOLUNTEERS OF AMERICA SOUTHEAST LOUISIANA; IINKA MITCHELL, individually and in her official capacity as Regional Property Manager; HOPE CENTER INC.; and KAREN ALLEN, individually and in her official capacity as Case Manager,

Defendants.

Civil Action No. **26 - 0815** Section ___ District Judge _____

Magistrate Judge ___ **SECT. CMAG.5**

## VERIFIED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND EMERGENCY INJUNCTIVE RELIEF

## INTRODUCTION

a. This action presents a federal court with a documentary record of coordinated

fraud against a federally administered housing program, sustained retaliation

against a disabled United States Air Force veteran for asserting his civil rights, and

the catastrophic human consequence of that retaliation: a young man's neurosurgery, required to treat a brain tumor, scheduled for March 2, 2026, cancelled. The defendants cancelled it. Not with a scalpel and not with a signature, but with fabricated financial records, systematic obstruction of federally administered rent payments, and a campaign of interference with a HUD-VASH housing voucher that left a veteran family's housing too unstable to support surgical recovery. That surgery has not occurred. It remains postponed indefinitely.

b. Plaintiff Eric David Edwards brings this action against Renaissance Neighborhood Development Corporation, Volunteers of America Southeast Louisiana, Regional Property Manager Iinka Mitchell, Hope Center Inc., and case manager Karen Allen for violations of the Fair Housing Act of 1968, the Rehabilitation Act of 1973, the Racketeer Influenced and Corrupt Organizations Act, 42 U.S.C. Section 1985(3), the Louisiana Equal Housing Opportunity Act, the Louisiana Unfair Trade Practices and Consumer Protection Law, and the Louisiana retaliatory eviction statute. The predicate conduct is documented in a forensic evidentiary record spanning 43 exhibits and 352 pages, including a PayNearMe transaction log documenting forty-one payment attempts of which fifteen were blocked by RNDC through deliberate account manipulation, two versions of a resident ledger whose forensic comparison reveals retroactive fabrication, and contemporaneous written communications establishing the defendants'

coordination and intent. This is not a landlord-tenant dispute. It is an organized scheme to extract federal Housing Assistance Payments through fabricated financial records, manufacture administrative grounds for the eviction of a federally protected tenant, and retaliate against that tenant for the exercise of rights that federal law unconditionally guarantees.

c. Mr. Edwards does not seek only damages. He seeks a declaration that the defendants violated federal and state law, a permanent injunction restraining further retaliatory conduct, an order requiring correction of the fabricated financial record that drives the defendants' eviction strategy, and emergency relief sufficient to stabilize his family's housing while this Court adjudicates his claims. The documentary record supports each element of every claim stated below. This complaint states those claims.

d. Every administrative submission, compliance attempt, payment, and response to defendants' demands made by Mr. Edwards from October 2023 through the date of this filing was made under conditions of economic and physical duress manufactured by defendants through the specific acts described herein. The compulsion defendants imposed on this household is addressed in full in the Declaration of Economic and Physical Duress filed simultaneously with this action and incorporated herein by reference.

## I. PARTIES

<u>The Plaintiff Is a Disabled Veteran Holding an Active Federal Housing Voucher.
His Family's Continued Access to Housing Is a Matter of Life and Death Because
His Son Requires Brain Surgery That the Defendants' Conduct Has Already Forced
to Be Cancelled Twice.</u>

1. Plaintiff Eric David Edwards is a natural person, a citizen of the United States, a disabled honorably discharged veteran of the United States Air Force, and the active holder of HUD-VASH Voucher No. 3561555 administered through the Department of Veterans Affairs. Mr. Edwards resides with his family at The Groves at Miles Branch in Covington, Louisiana, which is located within the Eastern District of Louisiana.

2. Mr. Edwards is a disabled person within the meaning of the Fair Housing Act, 42 U.S.C. Section 3602(h), and a person with a disability within the meaning of the Rehabilitation Act of 1973, 29 U.S.C. Section 705(20). He serves as the sole full-time caregiver and legal Power of Attorney for his adult son Nathan J. Edwards, whose severe medical condition requires continuous parental management.

3. Nathan J. Edwards (Date of Birth: June 30, 2005) is a twenty-year-old adult who resides with Mr. Edwards at The Groves at Miles Branch. Nathan

Edwards suffers from epilepsy and a left temporal lobe ganglioglioma, WHO Grade 1, BRAF V600E mutant, confirmed by surgical pathology on April 4, 2024, by Dr. Esther Dupepe at Ochsner Medical Center. He is a person with a disability within the meaning of the Fair Housing Act, 42 U.S.C. Section 3602(h), the Americans with Disabilities Act, 42 U.S.C. Section 12102, and the Rehabilitation Act. His neurosurgery was scheduled for March 2, 2026. The defendants' conduct caused that surgery to be cancelled and postponed indefinitely. He awaits that surgery.

4. Cameron D. Edwards is an adult member of the Edwards household residing at the same dwelling. He is a protected occupant of the household under applicable federal statutes. He executed a sworn affidavit on March 23, 2026, describing events he personally witnessed on March 13, 2026, produced herein as Exhibit 37. (*see EX-37 pg. 2 ¶ 2*)

## RNDC Is the HAP Contract Landlord, the Sole Owner of NEIGHBORWIPS, and the Primary Engine of the Scheme.

5. Defendant Renaissance Neighborhood Development Corporation ("RNDC") is a nonprofit corporation organized under the laws of Louisiana. RNDC manages The Groves at Miles Branch, a federally subsidized residential housing development located at 424 Purslane Drive, Covington, Louisiana,

St. Tammany Parish, within the Eastern District of Louisiana. The Groves at Miles Branch is a Low-Income Housing Tax Credit property subject to the requirements of 26 U.S.C. Section 42 and the Extended Use Agreement recorded with the Louisiana Housing Corporation, which independently prohibits RNDC from refusing to lease to holders of Section 8 vouchers under 26 U.S.C. Section 42(h)(6)(B)(iv). RNDC executes Housing Assistance Payment contracts with HUD, receives federal Housing Assistance Payments in connection with those contracts, and administers tenant accounts through its proprietary backend property management system, NEIGHBORWIPS, which also interfaces with the Yardi Voyager accounting platform. As a recipient of federal financial assistance for housing, RNDC is subject to the Fair Housing Act, the Rehabilitation Act of 1973, and 24 C.F.R. Part 982.

6. Defendant Volunteers of America Southeast Louisiana ("VOA-SELA") is a nonprofit corporation and the successor property management entity for The Groves at Miles Branch. VOA-SELA assumed management responsibility on January 21, 2026, with actual written notice of Mr. Edwards's pending civil rights claims. (*see EX-21 pg. 1 ¶ 1*) VOA-SELA is RNDC's 51 percent parent organization. Both entities share the address 4152 Canal Street, New Orleans, Louisiana, and operate under the same chief executive, making

independent oversight between these two entities structurally impossible. VOA-SELA immediately continued the retaliatory eviction campaign RNDC had launched, and is subject to the same federal statutory and regulatory requirements as RNDC.

7. Defendant Iinka Mitchell is a natural person who served at all relevant times as Regional Property Manager for VOA-SELA. Mitchell exercised supervisory authority over the management of The Groves at Miles Branch, directed the property management team responsible for Mr. Edwards's account, personally signed the second and third retaliatory eviction notices, generated the fourth fabricated recertification default notice four days after receiving Mr. Edwards's pre-litigation demand letter, and directed the physical destruction of a lease appointment calendar entry through deliberate application of correction fluid followed by termination of the employee who created it. Mitchell is sued in her individual capacity and in her official capacity as Regional Property Manager.

8. Defendant Hope Center Inc. ("Hope Center") is a nonprofit corporation that participates in the Supportive Services for Veteran Families program as a VA-approved service provider under 38 C.F.R. Part 62, receives federal VA grant funding in connection with that participation, and holds mandatory

intervention obligations under 38 C.F.R. Section 62.34 and mandatory reporting obligations under 38 C.F.R. Section 62.70. Hope Center holds institutional access to program participant records, recertification proceedings, and housing authority communications. Hope Center and its agent used that access to facilitate the defendants' scheme rather than to protect the client they were paid to serve.

9. Defendant Karen Allen is a natural person who served at all relevant times as a case manager at Hope Center with direct assignment to Mr. Edwards's SSVF case beginning in October 2022. (*see EX-11 pg. 1 ¶ 1*) Allen held institutional access to Mr. Edwards's housing assistance information, case file, and the administrative channels through which housing authority decisions affecting his tenancy were made. Allen is sued in her individual capacity and in her official capacity as case manager at Hope Center.

## II. JURISDICTION AND VENUE

**Federal Jurisdiction and Venue Are Proper, and No Administrative Exhaustion Requirement Bars This Action.**

10. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. Section 1331, as this action arises under the laws of the United States, including the Fair Housing Act, 42 U.S.C. Sections 3601-3631; the Rehabilitation Act of

1973, 29 U.S.C. Section 794; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sections 1961-1968; and 42 U.S.C. Section 1985(3).

11. This Court has jurisdiction over Mr. Edwards's Fair Housing Act claims pursuant to 42 U.S.C. Section 3613(a)(1)(A), which authorizes a person aggrieved by a discriminatory housing practice to commence a civil action in an appropriate federal district court not later than two years after the occurrence or termination of the alleged discriminatory housing practice.

12. This Court has supplemental jurisdiction over Mr. Edwards's state law claims pursuant to 28 U.S.C. Section 1367, as those claims form part of the same case or controversy as the federal claims and arise from the same nucleus of operative facts.

13. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. Section 1391(b)(2), as a substantial part of the events and omissions giving rise to the claims occurred at The Groves at Miles Branch in Covington, Louisiana, which is located in St. Tammany Parish within this district.

14. Mr. Edwards has not filed an administrative complaint with HUD regarding the claims asserted in this action. No administrative exhaustion requirement bars this action, and no 180-day administrative deferral period

applies. This Court may exercise jurisdiction immediately and without limitation.

## III. FACTUAL ALLEGATIONS

### A. The Federal Subsidy Structure and the Defendants' Legal Obligations

**The Defendants Are Not Passive Participants in a Federal Housing Program. They Applied for Federal Funds, Contracted for Them, and Accepted Every Legal Obligation That Attached to Them.**

15. The Groves at Miles Branch is a residential housing development located in Covington, Louisiana. RNDC and its successor VOA-SELA manage the property under Housing Assistance Payment contracts with HUD. The Groves at Miles Branch is also a LIHTC property subject to the Extended Use Agreement obligations of 26 U.S.C. Section 42(h)(6)(B)(iv), which independently and categorically prohibit RNDC from refusing to execute a lease with a holder of a Section 8 Housing Choice Voucher.

16. Under the Housing Assistance Payment contracts, HUD disburses federal funds to the property manager to subsidize the rent of qualified tenants participating in the Housing Choice Voucher program, including veterans participating in the HUD-VASH program. These funds originate from the

federal treasury and are disbursed pursuant to 24 C.F.R. Part 982 and 38 U.S.C. Section 8(o)(19).

17. By accepting Housing Assistance Payments from HUD, RNDC and VOA-SELA assumed binding non-negotiable legal obligations under the Fair Housing Act, the Rehabilitation Act of 1973, and applicable HUD regulations, including the absolute duty to accept compliant rent payment from HUD-VASH voucher holders, the duty to provide reasonable accommodations to tenants with qualifying disabilities, the duty to maintain accurate financial records of each tenancy, and the duty to refrain from retaliating against tenants who assert their rights under federal law.

18. Hope Center participates in the SSVF program as a VA-approved service provider. By accepting that participation status and federal grant funds, Hope Center assumed corresponding obligations to serve enrolled veterans honestly, impartially, and in strict conformity with 38 C.F.R. Part 62, including the mandatory intervention obligations of Section 62.34 and the mandatory reporting obligations of Section 62.70.

19. The defendants are not passive participants in a federal housing program. They accepted federal money to house a disabled veteran and his medically

vulnerable family. The obligations they assumed when they accepted that money are the obligations they violated.

## B. The HUD-VASH Voucher and Mr. Edwards's Protected Status

<u>Mr. Edwards Holds an Active Federal Housing Voucher and Occupies a Dwelling Protected by Multiple Overlapping Layers of Federal Civil Rights Law. The Defendants Attacked Him Anyway.</u>

20. The HUD-VASH program is a joint initiative of the Department of Veterans Affairs and the Department of Housing and Urban Development that provides rental assistance to eligible veterans through Housing Choice Vouchers administered under Section 8 of the United States Housing Act of 1937, 42 U.S.C. Section 1437f. The program exists because Congress determined that veterans who served this country deserve stable housing and that the federal government bears a responsibility for ensuring it.

21. Mr. Edwards holds HUD-VASH Voucher No. 3561555, which is currently active and administered by the Covington Housing Authority. The voucher entitles Mr. Edwards to occupy a qualifying unit at The Groves at Miles Branch with HUD subsidizing the approved portion of his rent calculated under 24 C.F.R. Section 982.505, and Mr. Edwards responsible for the applicable tenant share.

22. Mr. Edwards's disability and his status as a HUD-VASH voucher holder establish overlapping and independent protections under the Fair Housing Act, 42 U.S.C. Section 3604(f); the Rehabilitation Act of 1973, 29 U.S.C. Section 794; and applicable VA and HUD program regulations. These protections attach to his person. They follow him into his tenancy. No property management decision, no administrative maneuver, and no fabricated financial record can extinguish them.

23. Nathan J. Edwards's epilepsy and temporal lobe ganglioglioma constitute qualifying disabilities under 42 U.S.C. Section 3602(h). The Social Security Administration issued a Benefit Verification Letter dated March 15, 2026, confirming Nathan receives Social Security Disability Insurance benefits based on a determination of total disability. (*see EX-42 pg. 1 ¶ 1*) Nathan Edwards resides in Mr. Edwards's household. His status as a person with a disability within the household independently triggers the household's entitlement to reasonable accommodations under 42 U.S.C. Section 3604(f)(3)(B), regardless of and in addition to Mr. Edwards's own independent entitlement.

24. Mr. Edwards submitted a formal request for reasonable accommodations to RNDC for his disability and Nathan Edwards's disability. That request was

legally protected activity under 42 U.S.C. Section 3617, which prohibits any person from coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of any right granted or protected by the Fair Housing Act. What followed that request is the subject of this complaint.

25. On July 3, 2025, the Kenner Housing Authority issued HUD-VASH Voucher No. 8151876 to Mr. Edwards. RNDC refused to execute the written lease required as a mandatory precondition for continued HAP participation under 24 C.F.R. Section 982.308 for four consecutive months. RNDC's refusal directly caused Voucher No. 8151876 to expire on October 31, 2025, destroying a federal housing benefit Mr. Edwards cannot retroactively recover. (*see EX-14 pg. 1 ¶ 1*) RNDC continued collecting Housing Assistance Payments throughout the period of its lease execution refusal.

## C. The Systematic Obstruction of Rent Payment

<u>The Defendants Built a Mechanism: Block the Payment, Record the Block as Non-Payment, Use the Non-Payment Record to Manufacture Default, and Deploy the Manufactured Default as the Predicate for Eviction of a Disabled Federal Housing Program Participant.</u>

26. Beginning no later than October 2023 and continuing through April 4, 2026, RNDC and VOA-SELA systematically blocked Mr. Edwards's ability to tender rent payment through every available channel.

27. RNDC designated the PayNearMe platform as the official and exclusive tenant-facing payment system for rent transactions at The Groves at Miles Branch. RNDC's own written rent payment policy mandates exclusive use of the PayNearMe channel and prohibits money orders. (*see EX-36 pg. 1 ¶ 1*) Mr. Edwards used that designated system. He used it forty-one times from October 2023 through April 4, 2026. The complete PayNearMe transaction log is a 36-page contemporaneous electronic record of each attempt, produced as Exhibit 1. (*see EX-1 pg. 1*)

28. Of those forty-one payment attempts, fifteen were refused, blocked, or reversed through administrative action on Mr. Edwards's account. The refusals did not reflect insufficient funds on Mr. Edwards's part. They did not reflect tenant error. They reflect deliberate account manipulation by the defendants through RNDC's proprietary NEIGHBORWIPS backend system.

**NEIGHBORWIPS Has No Public Tenant Portal. Every Block Required a Human Decision by an RNDC Agent. Fifteen Blocks Required Fifteen Such Decisions, or One Deliberate Permanent Configuration Change.**

29. RNDC operates NEIGHBORWIPS, a proprietary backend property management and payment configuration system that controls the acceptance parameters for each tenant account and interfaces with the Yardi Voyager accounting platform. NEIGHBORWIPS has no public-facing tenant portal. Its interface, its audit logs, and its configuration controls are accessible exclusively to RNDC and its authorized agents. Blocking a payment in NEIGHBORWIPS requires affirmative configuration action by an RNDC agent. Fifteen payment blocks required fifteen such decisions, or a single deliberate system configuration change designed to prevent payment permanently. The Yardi Voyager Resident Ledger Audit Report for tenant account t0004702, property no1140, Unit 136E, will show the specific RNDC administrator responsible for each configuration action, with username, workstation, and timestamp. Those records are in RNDC's exclusive possession and have been named specifically in written evidence preservation demands.

30. While blocking Mr. Edwards's payment attempts through NEIGHBORWIPS, RNDC simultaneously recorded the blocked payments on his account as failures to pay rather than as payment attempts that RNDC itself refused. The result was a fabricated arrearage that accumulated month by month on Mr. Edwards's account, each month building a larger

manufactured default, each manufactured default providing additional cover for the eviction campaign the defendants were simultaneously conducting.

31. RNDC extracted an unauthorized WIPBKFEE charge of $3.99 on every completed PayNearMe transaction throughout the tenancy, imposed through NEIGHBORWIPS configuration with no authorization in the HAP contract, any HUD regulation, or any disclosed fee schedule. (*see EX-1 pg. 3 through 36*)

32. The most recent NEIGHBORWIPS blocking occurred on April 4, 2026, three days before the filing of this action. RNDC blocked Mr. Edwards's payment of $572.50 submitted via Cash at CVS, Account No. 220105561363, Confirmation No. 821751530238, using the identical mechanism documented across fourteen prior blocking events. (*see EX-1 pg. 1*) RNDC then imposed a $75.00 late fee as a direct consequence of the obstruction it engineered. RNDC blocked the only payment channel it authorizes and charged Mr. Edwards for the non-processing it caused. The most recent confirmed complete payment was March 4, 2026, in the amount of $576.49. (*see EX-1 pg. 1*)

33. This was not a billing dispute. A billing dispute is a good-faith disagreement between parties over amounts owed. What RNDC and VOA-

SELA operated was a mechanism: configure the account to block payment, record the blocked payment as non-payment, use the accumulated non-payment record to manufacture default, and deploy the manufactured default as the legal predicate for eviction of a disabled federal housing program participant. That mechanism is documented in forty-one rows of a transaction log. (*see EX-1 pg. 1 through 36*)

## D. The Fabricated Resident Ledger

**The Defendants Altered the Financial Record of This Tenancy After the Fact. The Alteration Is Forensically Visible and Forensically Provable Because Mr. Edwards Possessed the Baseline Before the Fabrication Occurred.**

34. RNDC maintained a resident ledger for Mr. Edwards's account at The Groves at Miles Branch. That ledger is the official financial record of the tenancy, organized chronologically and maintained in the ordinary course of RNDC's property management operations. Under federal evidence law, it is a business record. It is also the record that RNDC fabricated.

35. Mr. Edwards obtained two versions of his resident ledger at different points during the tenancy. He obtained the baseline ledger directly from RNDC on October 3, 2025, and has maintained continuous possession of it since that date. (*see EX-3 pg. 1*) A forensic comparison of the baseline resident ledger against the subsequently produced version, obtained February 4, 2026,

reveals retroactive transaction insertions: entries appearing in the later document that did not exist in the earlier document, recorded with backdated transaction dates purporting to place those entries in prior periods. (*see EX-3 pg. 1 ¶ 1; see EX-9 pg. 1 ¶ 1*) These entries are not payments received after the baseline was produced. They are fabrications inserted into the historical record of the account after the baseline was already in Mr. Edwards's possession.

36. Between October 3, 2025 and February 4, 2026, RNDC retroactively inserted a tbs-susp entry manufacturing $1,370.10 in fabricated arrears into the resident ledger. That entry does not appear in the baseline ledger. (*see EX-3 pg. 1 ¶ 1*) It appears in the manipulated ledger produced February 4, 2026. (*see EX-9 pg. 1 through 4*) The entry was backdated to appear as a pre-existing obligation. The direct comparison of these two documents, one in Mr. Edwards's possession before the entry existed and one produced after, is the forensic proof of retroactive insertion.

**The $242.10 Charge Does Not Exist in the Baseline Ledger. It Has No Contractual Basis. It Was Fabricated to Inflate the Apparent Arrearage.**

37. Among the retroactively inserted entries in the manipulated ledger is a charge of $242.10 that does not appear in the baseline document. (*see EX-9*

*pg. 2 ¶ 1; see EX-3 pg. 1 ¶ 1)* This charge carries no corresponding payment record, no corresponding service record, and no contractual basis in Mr. Edwards's governing lease. It was inserted to inflate the apparent arrearage and create a numerical shortfall that RNDC could present as grounds for default.

38. The Hope Center subsidy payments reflected in the resident ledger establish a second, independent category of financial fraud. The approved Hope Center SSVF subsidy contribution to Mr. Edwards's housing cost is $462.50 per month, as documented in the TBS entries of the baseline ledger. (*see EX-3 pg. 1 ¶ 1*) RNDC applied a figure of $414.00 in its internal account calculations, a figure that is not supported by any governing agreement, regulatory determination, or HUD-approved calculation. RNDC applied the $414.00 figure while collecting $462.50 from the federal program, manufacturing a per-month discrepancy of $48.50 that RNDC retained without legitimate authorization. Extended across the full period of the defendants' misconduct, this systematic discrepancy represents a structured extraction of federal subsidy funds from the federal treasury.

39. The modification of the resident ledger required access to RNDC's Yardi Voyager accounting platform and NEIGHBORWIPS configuration system.

The Yardi Voyager audit logs record the user credentials, timestamps, and specific action entries for every modification made to every tenant account. Those logs will show who modified Mr. Edwards's account, when the modifications occurred, and what changes were made. Those logs are in RNDC's exclusive possession. They have been named specifically in written evidence preservation demands served on RNDC.

40. The two documents cover the same account, the same property, and the same tenancy. They cannot both be accurate. The baseline ledger reflects the account before the fabrication. The manipulated version contains fabricated entries. The difference between the two documents is the evidence of the crime.

## E. The Reasonable Accommodation Request and the Retaliatory Campaign

**Mr. Edwards Made a Lawful Federal Request and the Defendants Answered It with a Coordinated Campaign of Retaliation. That Is the Definition of a Section 3617 Violation.**

41. Mr. Edwards submitted a formal written reasonable accommodation request to RNDC identifying his qualifying disability and Nathan Edwards's qualifying disability, describing the specific accommodations sought, and establishing the causal nexus between the disabilities and the need for the requested accommodations. The request was facially sufficient under the

requirements of the Fair Housing Act and HUD guidance on disability-related accommodation requests.

42. RNDC denied the reasonable accommodation request without engaging the legally required interactive process. The HUD Multifamily Occupancy Handbook 4350.3 REV-1, Paragraph 2-40C, makes interactive dialogue mandatory before any denial. Paragraph 2-40F establishes that silence or failure to respond promptly constitutes a denial of the request. The Joint Statement of the Department of Housing and Urban Development and the Department of Justice on Reasonable Accommodations Under the Fair Housing Act reinforces both requirements. RNDC denied the request without the interactive process, without any documented analysis of undue burden or fundamental alteration, and without identifying any basis on which the accommodation would alter its housing operations. The denial was bare, unsupported, and unlawful.

43. The sequence that followed the denial establishes retaliation as a matter of direct evidence. The protected activity preceded every element of the defendants' escalating campaign against Mr. Edwards's tenancy. The campaign intensified in exact proportion to Mr. Edwards's assertion of his rights. The causal connection is the timeline.

### The Correction Fluid Incident Is Not an Administrative Oversight. It Is an Act of Physical Destruction of a Document in a Federally Administered Housing Transaction.

44. On a date in the latter part of 2023, an RNDC agent used a correction fluid substance to obliterate scheduling information appearing on a document connected to Mr. Edwards's lease appointment under the HUD-VASH program. The deliberate physical alteration of a document in a federally administered housing transaction is an act calculated to prevent a protected tenant from completing the administrative steps required to secure his lease. It constitutes interference with Mr. Edwards's rights under 42 U.S.C. Section 3617 and tampering with a record in a federal proceeding within the meaning of 18 U.S.C. Section 1512(c)(1). RNDC directed the termination of the employee who had scheduled the appointment.

45. The retaliatory campaign included coordinated action across multiple defendants. RNDC accelerated its administrative manipulation of Mr. Edwards's account in NEIGHBORWIPS, increasing the frequency of payment blocks following the accommodation request. RNDC served recertification notices framed in threatening language accompanied by documentation demands exceeding what HUD regulations authorize. Hope Center agent Karen Allen communicated to Mr. Edwards that his continued

housing participation was contingent on compliance with demands that had no regulatory basis. Mitchell, exercising her authority as Regional Property Manager, directed these activities through her supervisory authority over the property management operation.

46. The interference with HUD-VASH Voucher No. 3561555 is independently cognizable retaliation under 42 U.S.C. Section 3617. The voucher is the legal mechanism through which Mr. Edwards exercises his right under the Fair Housing Act to equal access to federally subsidized housing. Interference with the voucher is interference with the right. The defendants interfered with the voucher deliberately, repeatedly, and in direct response to Mr. Edwards's assertion of his rights.

47. RNDC's four-month refusal to execute the written lease required under 24 C.F.R. Section 982.308 following issuance of Voucher No. 8151876 on July 3, 2025, constitutes a separate and independent act of interference under Section 3617, as well as a per se violation of the LIHTC Extended Use Agreement obligation under 26 U.S.C. Section 42(h)(6)(B)(iv). That refusal directly destroyed Voucher No. 8151876 on October 31, 2025, and forced Mr. Edwards to restart the entire federal housing application process while simultaneously managing Nathan's pre-operative medical care and

defending against retaliatory eviction proceedings without legal representation.

**F. The January 4, 2024 Coordination Event**

<u>On a Single Day, RNDC Simultaneously Blocked Mr. Edwards's Rent Payment and Launched the Administrative Eviction Process. That Simultaneity Is Not Coincidence. It Is the Fingerprint of Conspiracy.</u>

48. January 4, 2024, is the most critical single date in the documentary record. On that date, RNDC executed two distinct adverse administrative actions simultaneously: it blocked Mr. Edwards's rent payment through its NEIGHBORWIPS system, transmitting a fabricated balance of $918.51 through the PayNearMe electronic network, a figure corresponding to no legitimate entry in either version of the resident ledger (*see EX-1 pg. 7 ¶ 1*); and it generated the first formal recertification default notice in the administrative sequence that RNDC and VOA-SELA would deploy two years later as stated grounds for eviction (*see EX-3 pg. 1 ¶ 1*).

49. These two actions cannot have been coincidental. Blocking a tenant's payment creates a default record on the non-payment track. Generating a recertification default notice on the same day creates a compliance default record on a parallel administrative track. Together, the two actions establish dual converging pathways toward a single result: the elimination of Mr.

Edwards's federal housing protection by any administrative means available. The payment default supports termination on non-payment grounds. The recertification default supports termination through the administrative eligibility review track. The defendants constructed both on the same afternoon.

50. The execution of this strategy required advance planning, coordinated decision-making across the defendant enterprise, and the simultaneous triggering of multiple independent administrative systems. It is not spontaneous conduct. It is the operation of an organized scheme.

51. The January 4, 2024 coordination event is documented in the resident ledger entries for that date (*see EX-3 pg. 1 ¶ 1; see EX-9 pg. 1 ¶ 1*) and in the PayNearMe transaction log (*see EX-1 pg. 1 ¶ 1*). Both the payment block and the recertification default are preserved in the evidentiary record. The temporal coordination is established with precision.

52. RNDC served three additional retaliatory recertification notices on July 1, 2024; May 6, 2025; and January 14, 2026. Each recertification demand was served while RNDC was simultaneously obstructing Mr. Edwards's rent payments through the NEIGHBORWIPS blocking configuration. On January 11, 2026, Mitchell generated a fourth fabricated recertification

default notice four days after receiving Mr. Edwards's pre-litigation demand letter, identified as her work by the signature notation "tchell Regional." (*see EX-22 pg. 5 ¶ 1*)

## G. The RICO Enterprise: Structure, Operation, and Predicate Acts

**The Defendants Did Not Commit Isolated Violations in Parallel. They Operated a Unified Enterprise Whose Affairs They Conducted Through Federal Crimes Repeated Continuously Across More Than Two Years.**

53. At all relevant times, RNDC, VOA-SELA, Mitchell, Hope Center, and Allen formed and operated an association-in-fact enterprise within the meaning of 18 U.S.C. Section 1961(4). The enterprise's existence is established by three independent evidentiary markers: the coordinated execution of the January 4, 2024 simultaneous payment block and recertification default; the coordinated fabrication and subsequent production of the manipulated resident ledger; and the coordinated interference with Mr. Edwards's HUD-VASH voucher by property management and case management agents acting in concert, documented without resort to inference by the CC: Hope Center Inc. designation on the face of the March 27, 2026 eviction notice. (*see EX-43 pg. 1 ¶ 1*)

54. The enterprise's common purpose was the systematic extraction of federal Housing Assistance Payments in excess of amounts authorized under

governing regulations, the concealment of that extraction through fabricated resident ledger entries, and the elimination of tenants who discovered or challenged the scheme through coordinated retaliation and manufactured administrative grounds for eviction.

### The Enterprise's Additional Motive Is Conversion of Subsidized Units to Market-Rate Occupancy in Violation of the LIHTC Extended Use Agreement.

55. A secondary and reinforcing enterprise objective is the conversion of Mr. Edwards's unit to market-rate occupancy in violation of the Extended Use Agreement obligation under 26 U.S.C. Section 42(h)(6)(B)(iv). Removal of a HUD-VASH voucher holder from a LIHTC property would allow RNDC to re-lease the unit at market rate, generating substantially higher rental revenue while evading the LIHTC compliance monitoring obligations that attach to subsidized occupancy.

56. The enterprise's affairs affected interstate commerce. HUD Housing Assistance Payments originate from federal appropriations and travel through interstate wire transfer systems to reach property managers. NEIGHBORWIPS and Yardi Voyager are software platforms processing financial transactions through electronic systems affecting interstate commerce. PayNearMe processes payments through national electronic

payment networks. Each WIPBKFEE extraction and each fabricated HAP claim moved through interstate electronic channels. The enterprise operated through and affected interstate commerce within the meaning of 18 U.S.C. Section 1962.

57. Each defendant conducted or participated in the conduct of the enterprise's affairs within the meaning of the operation-or-management test established in *Reves v. Ernst and Young*, 507 U.S. 170, 179 (1993). RNDC and VOA-SELA operated the financial infrastructure of the scheme, controlling NEIGHBORWIPS, Yardi Voyager, and the Housing Assistance Payment accounts. Mitchell directed the day-to-day property management execution from her position as Regional Property Manager. Hope Center and Allen provided the case management access that enabled coordinated interference with Mr. Edwards's voucher from the administrative side of the HUD-VASH program structure. Each defendant operated a distinct and necessary component of the enterprise.

58. The first category of predicate acts constituting the pattern of racketeering activity is wire fraud under 18 U.S.C. Section 1343. Each NEIGHBORWIPS payment rejection transmitted a fabricated balance figure through the PayNearMe electronic network to Mr. Edwards's consumer account. Each

such transmission was a completed electronic communication containing a misrepresentation of fact executed for purposes of the scheme. RNDC and VOA-SELA also submitted Housing Assistance Payment claims to HUD through interstate electronic transmissions representing entitlements to subsidy payments they had manufactured through ledger fabrication. Each electronic submission of a fraudulent HAP claim constitutes a separate completed act of wire fraud. Hope Center's electronic billing submissions to the VA for SSVF services not rendered constitute additional wire fraud predicates. (*see EX-1 pg. 1 through 36; see EX-11 pg. 9 through 10*)

59. The second category of predicate acts is theft of government funds under 18 U.S.C. Section 641. RNDC and VOA-SELA received federal Housing Assistance Payments based on subsidy calculations they had fraudulently manipulated. The $48.50 per-month difference between the approved $462.50 subsidy and the $414.00 figure RNDC applied in its internal calculations represents federal funds received without lawful entitlement. (*see EX-3 pg. 1 ¶ 1*) RNDC's collection of Housing Assistance Payments during the four months it refused to execute a valid lease for Voucher No. 8151876 constitutes a second independent category of theft of government funds. (*see EX-14 pg. 1 ¶ 1*)

60. The third category of predicate acts is obstruction and tampering under 18 U.S.C. Section 1512. The obliteration of scheduling information from Mr. Edwards's lease appointment document through deliberate application of correction fluid constitutes tampering with a document in a federal proceeding within the meaning of 18 U.S.C. Section 1512(c)(1). The retroactive alteration of the resident ledger to insert fabricated arrears entries constitutes tampering with a record or document with intent to impair its use in an official proceeding within the meaning of 18 U.S.C. Section 1512(c)(1). The systematic blocking of Mr. Edwards's payment attempts following his assertion of his legal rights constitutes retaliatory interference with a person's participation in a federal program within the meaning of 18 U.S.C. Section 1512(d).

61. The fourth category of predicate acts is conspiracy under 18 U.S.C. Section 371. The documented coordination between RNDC, VOA-SELA, Mitchell, Hope Center, and Allen, established through the January 4, 2024 simultaneous execution of multiple adverse administrative actions, the cross-entity fabrication of the resident ledger, and the coordinated communications that Allen directed to Mr. Edwards at the same time RNDC was executing its payment obstruction, satisfies every element of conspiracy to defraud the United States under 18 U.S.C. Section 371.

**The Pattern Spans More Than Two Years, Touches Every Category of Racketeering Activity, and Was Actively Ongoing on the Date This Complaint Was Filed.**

62. The predicate acts constitute a pattern of racketeering activity within the meaning of 18 U.S.C. Section 1961(5). The acts are related by common purpose, common victim, common participating actors, and common method. They span from at least October 2023 through April 4, 2026, a period exceeding two years, satisfying closed-ended continuity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The defendants' continuing management of the property and their ongoing structural relationship establish open-ended continuity as well.

63. Each defendant agreed to and participated in the conspiracy to violate 18 U.S.C. Section 1962(c) within the meaning of 18 U.S.C. Section 1962(d). The agreement need not be express. The coordinated conduct of each defendant, as documented throughout the evidentiary record and confirmed without inference by the face of Exhibit 43, establishes that each defendant understood the scheme and chose to operate within it. *United States v. Salinas*, 522 U.S. 52, 65 (1997).

64. Mr. Edwards sustained injury to his business and property by reason of the defendants' violations of 18 U.S.C. Section 1962 within the meaning of 18

U.S.C. Section 1964(c). His injuries include amounts fabricated and extracted from his account without lawful basis, the loss of federal subsidy benefits to which he is entitled, the destruction of Voucher No. 8151876, the damage to his housing record caused by the defendants' manufactured default, and all consequential economic and non-economic harm flowing from the defendants' coordinated scheme. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

65. Three former RNDC employees with personal knowledge of the calendar destruction event. Parallel criminal referrals have been submitted simultaneously with this civil action to the Office of the United States Attorney for the Eastern District of Louisiana and the Federal Bureau of Investigation addressing potential violations of 18 U.S.C. Sections 641, 1341, 1343, 1512, and 1519.

## H. The Cancellation of Nathan Edwards's Neurosurgery

The Defendants' Campaign Reached Its Most Irreversible Consequence on March 2, 2026. A Young Man Required Brain Surgery. His Family Had No Stable Home to Recover In. The Surgery Did Not Happen.

66. Nathan J. Edwards requires neurosurgical intervention for his temporal lobe ganglioglioma. The condition causes epileptic seizures producing up to twenty or more discrete events per day and presents life-threatening risk if

the underlying tumor is left untreated. His secondary diagnoses include dangerous wandering without awareness, drop seizures with loss of consciousness, cardiac complications under active evaluation at Ochsner Health System, documented abnormal electrocardiogram findings, and elevated troponin results. Neurosurgery was the prescribed course of treatment declared medically necessary by his treating team.

67. Nathan Edwards's neurosurgery, the Placement of Stereo EEG Leads under the care of Dr. Lora Kahn at Ochsner Jefferson Highway Surgery, Second Floor, was scheduled for March 2, 2026. Mr. Edwards confirmed that appointment in Nathan's MyOchsner patient portal on December 17, 2025, where the March 2, 2026 procedure appeared as an active confirmed upcoming appointment. (*see EX-13 pg. 1 ¶ 1*) Pre-operative planning was complete. The procedure was set to occur on that date.

68. Neurosurgical recovery requires a stable, safe, and secure home environment. A patient recovering from brain surgery cannot be discharged into a household whose continued existence the patient's own family cannot guarantee for the following week. A surgical team discharging a brain surgery patient will not send that patient home to a family facing active

eviction proceedings based on fabricated financial records. The defendants created that uncertainty. The surgery was the casualty.

**Mitchell Served the February 27, 2026 Eviction Notice Three Days Before Nathan's Scheduled Surgery. The Surgery Was Cancelled. No Damages Award Paid Years from Now Restores the Time Nathan Has Spent Waiting.**

69. Mr. Edwards received the February 27, 2026 eviction notice from Mitchell exactly three days before Nathan's scheduled March 2, 2026 neurosurgery. (*see EX-22 pg. 1 ¶ 1*) Nathan Edwards's neurosurgery was cancelled on or before March 2, 2026, and has been postponed indefinitely. Mr. Edwards confirmed the cancellation when he reviewed Nathan's MyOchsner patient portal on March 23, 2026. The March 2, 2026 procedure does not appear in that updated record. No rescheduled date appears anywhere. (*see EX-35 pg. 1 ¶ 1*) The surgery was there. Then it was not. The eviction notice is the reason.

70. Nathan Edwards has an MRI scheduled for April 17, 2026, and an oncology appointment with Dr. Craig Lotterman at Ochsner Covington River Chase Pediatric Oncology on April 21, 2026. He needs surgery. He does not have a surgery date. His tumor does not wait for legal proceedings, and no monetary remedy paid after trial can restore the neurological integrity sacrificed in the interval between now and whenever surgery

finally occurs. The affidavit of Cameron D. Edwards, executed on March 23, 2026, describing events of March 13, 2026, provides direct personal knowledge testimony regarding household conditions and circumstances in the period following the surgery cancellation. (*see EX-37 pg. 2 ¶ 2 and 4*)

## I. The Role of Hope Center and Karen Allen

**Hope Center and Karen Allen Used Their Case Management Access to Mr. Edwards's Federal Records to Facilitate the Scheme Rather Than to Protect the Client They Were Paid to Serve.**

71. Hope Center occupies a position of institutional trust in the SSVF program. Approved SSVF service providers hold access to program participant records, participate in recertification proceedings on behalf of clients, and are required to report program violations under 38 C.F.R. Sections 62.34 and 62.70. Allen, as Mr. Edwards's assigned SSVF case manager, held direct institutional access to his case file and the administrative channels through which housing authority decisions were made. That access obligated Allen to act in Mr. Edwards's interest. Allen did not fulfill that obligation.

72. On September 23, 2025, the day after RNDC served the fraudulent $807.60 eviction notice, Mr. Edwards sent Allen a photograph of the eviction notice by text message and asked her to intervene. Allen received it. Allen took no documented action and filed no required report. (*see EX-12 pg. 9 ¶ 5*) Allen

did not contact RNDC. Allen did not report the eviction threat to the VA or HUD as required by 38 C.F.R. Section 62.34.

73. Allen never intervened to challenge RNDC's payment obstruction, the fabricated ledger entries, the fabricated recertification defaults, or any of the three retaliatory eviction notices Mr. Edwards received. Her failure to act is documented across the entirety of the relevant period. Hope Center simultaneously billed the VA for SSVF housing stabilization services from July 2025 through at least January 2026, a period during which Allen provided no documented support to Mr. Edwards's household. (*see EX-11 pg. 9 through 10; see EX-12 pg. 1 through 9*)

74. Allen communicated to Mr. Edwards conditions regarding his continued housing participation that were not authorized by HUD or VA regulations and that were calculated to pressure Mr. Edwards into compliance with RNDC's administrative scheme. Those communications occurred contemporaneously with RNDC's account manipulations, establishing temporal and operational coordination between Hope Center and RNDC.

**The CC Line on Exhibit 43 Is Not Circumstantial Evidence of Coordination. It Is Direct Documentary Proof of an Agreement Printed in Mitchell's Own Signature Block.**

75. On March 27, 2026, Mitchell signed and caused to be served on Mr. Edwards a third 30-Day Notice to Vacate for Non-Compliance citing the identical four fabricated recertification grounds Mr. Edwards had already defeated in his sworn answer of March 2, 2026. (*see EX-43 pg. 1 ¶ 1*) That notice bears two CC lines on its face: Cc: Hope Center Inc., and Cc: File. The Regional Property Manager of VOA-SELA copied Mr. Edwards's federally funded SSVF case management agency on his eviction notice. On March 30, 2026, four days after that notice was served, a VA HUD-VASH case worker called Mr. Edwards and disclosed that she had already spoken with Hope Center before calling him. She relayed Hope Center's offer to pay a $36 birth certificate fee on his behalf and stated explicitly that she was not required to report the matters they were discussing. Mr. Edwards reserves all rights against government parties for a subsequent filing. The conduct of Hope Center and Allen in this documented coordination is within the scope of this action.

## IV. CLAIMS FOR RELIEF

## COUNT I

**Violation of the Fair Housing Act: Retaliation and Interference 42 U.S.C. Section 3617 (Against All Defendants)**

Every Retaliatory Act Taken Against Mr. Edwards After He Requested
Accommodation Is a Federal Civil Rights Violation, and the Sequence of Conduct
in the Record Leaves No Room for Any Other Characterization.

76. Mr. Edwards incorporates paragraphs 1 through 75 as if fully stated in this
Count.

77. Section 3617 of the Fair Housing Act makes it unlawful to coerce,
intimidate, threaten, or interfere with any person in the exercise or
enjoyment of, or on account of having exercised or enjoyed, any right
granted or protected by Sections 3603, 3604, 3605, 3606, or 3616 of the Fair
Housing Act. Mr. Edwards exercised rights protected under Section 3617 by
requesting reasonable accommodation under 42 U.S.C. Section 3604(f)(3)
(B) and by submitting federal civil rights complaints and demand letters
documented in the evidentiary record.

78. Following Mr. Edwards's exercise of those rights, the defendants engaged
in a campaign of retaliation and interference satisfying each element of a
Section 3617 claim: protected activity, adverse housing actions, and a causal
connection established by both temporal proximity and direct documentary
evidence.

79. The defendants' retaliatory and interfering conduct includes blocking forty-
one rent payment attempts of which fifteen were blocked through

NEIGHBORWIPS configuration while recording those blocks as non-payments; issuing retaliatory recertification demands exceeding the requirements of applicable regulations; fabricating $1,370.10 in arrearage entries to manufacture default; coordinating the January 4, 2024 simultaneous payment block and recertification default; physically altering a lease appointment document to obstruct Mr. Edwards's ability to secure his housing; refusing to execute a written lease for Voucher No. 8151876 causing its destruction; and using Allen's institutional case management access to impose unauthorized conditions on Mr. Edwards's continued voucher participation.

80. The defendants acted with actual knowledge of Mr. Edwards's protected status, actual knowledge of his reasonable accommodation request, and deliberate intent to interfere with his exercise of federally protected rights. Their conduct was not negligent. It was retaliatory by design.

81. The defendants' violations of 42 U.S.C. Section 3617 directly and proximately caused Mr. Edwards damages including financial harm from fabricated charges, harm to his housing record from the manufactured default, consequential harm to his family's stability, and the medical harm to Nathan Edwards resulting from the cancelled neurosurgery.

## COUNT II

<u>Violation of the Fair Housing Act: Disability Discrimination in the Terms, Conditions, and Privileges of Rental Housing 42 U.S.C. Sections 3604(f)(1) and 3604(f)(2) (Against RNDC, VOA-SELA, and Mitchell)</u>

82. Mr. Edwards incorporates paragraphs 1 through 81 as if fully stated in this Count.

83. Section 3604(f)(1) of the Fair Housing Act makes it unlawful to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap. Section 3604(f)(2) makes it unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of a handicap.

<u>RNDC Made Mr. Edwards's Dwelling Unavailable to Him by Destroying the Federal Voucher That Made It Accessible. That Is a Section 3604(f)(1) Violation.</u>

84. RNDC's four-month refusal to execute the written lease required for Voucher No. 8151876 made the dwelling unavailable to Mr. Edwards within the meaning of Section 3604(f)(1) by destroying the federal instrument through which he exercised his right to occupy it. RNDC accomplished this through a facially neutral administrative mechanism, lease execution refusal, whose discriminatory effect on Mr. Edwards as a disabled HUD-VASH

voucher holder is established by the direct causal sequence from refusal to voucher destruction. RNDC's verbal admission that no written lease exists or is required, made directly to Mr. Edwards, constitutes a statement of the discriminatory policy.

85. RNDC and VOA-SELA subjected Mr. Edwards to discriminatory terms, conditions, and privileges of tenancy within the meaning of Section 3604(f)(2) through the following documented conduct: the NEIGHBORWIPS payment obstruction scheme applied specifically to Mr. Edwards's account; the retroactive fabrication of arrearage entries creating discriminatory account conditions; the imposition of unauthorized WIPBKFEE charges on every completed transaction; the issuance of three retaliatory eviction notices targeting a federally protected disabled household; and the coordinated recertification harassment campaign designed to convert Mr. Edwards's continued occupancy into a perpetual compliance obligation with no legitimate regulatory basis. Each of these conditions was imposed on Mr. Edwards's account because of his disability and his status as a HUD-VASH voucher holder.

86. The defendants' violations of 42 U.S.C. Sections 3604(f)(1) and 3604(f)(2) directly and proximately caused the damages described throughout this

complaint, including the destruction of Voucher No. 8151876, the fabricated arrearage on Mr. Edwards's account, the three retaliatory eviction notices, and the resulting cancellation of Nathan Edwards's neurosurgery.

## COUNT III

**Violation of the Fair Housing Act: Refusal to Make Reasonable Accommodation 42 U.S.C. Section 3604(f)(3)(B) (Against RNDC, VOA-SELA, and Mitchell)**

**RNDC Refused to Accommodate a Disabled Veteran and His Totally Disabled Son. Federal Law Does Not Permit a Housing Provider to Make That Choice Absent a Demonstrated Undue Burden. RNDC Demonstrated Nothing.**

87. Mr. Edwards incorporates paragraphs 1 through 86 as if fully stated in this Count.

88. Section 3604(f)(3)(B) of the Fair Housing Act establishes that the prohibition on discrimination in rental housing on the basis of disability includes a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling. *Bhogaita v. Altamonte Heights Condominium Association*, 765 F.3d 1277, 1285 (11th Cir. 2014).

89. Mr. Edwards and Nathan Edwards each independently satisfy the disability element. Mr. Edwards's disability is confirmed by VA Pension Award Letter

dated December 1, 2025. (*see EX-39 pg. 1 ¶ 1*) Nathan Edwards satisfies the federal total disability standard as confirmed by SSA Benefit Verification Letter dated March 15, 2026. (*see EX-42 pg. 1 ¶ 1*) The disability determination required for SSDI eligibility is more demanding than the disability definition under the Fair Housing Act; a household member who satisfies the Social Security Administration's total disability standard more than satisfies the Fair Housing Act's definition. *School Board of Nassau County v. Arline*, 480 U.S. 273, 280 (1987).

90. The accommodations Mr. Edwards requested were reasonable. They did not require RNDC to incur extraordinary expense, did not alter the fundamental character of RNDC's housing operations, and would have placed no undue burden on RNDC's administration of the property. RNDC's legal obligation required it to engage in an interactive process, assess the request in good faith, and provide the accommodation unless it could demonstrate undue burden or fundamental alteration. RNDC took none of these steps.

91.RNDC and VOA-SELA refused to provide the requested accommodations. Mitchell, as Regional Property Manager, directed or ratified that refusal. No documentation of any undue burden analysis, any fundamental alteration

determination, or any good-faith interactive engagement with Mr. Edwards's request exists in the record because RNDC conducted none of these required processes. *Alexander v. Choate*, 469 U.S. 287, 300-01 (1985).

92. HUD Form 52646, Section 6, provides that if a family member with a disability needs and requests an extension of the voucher term as a reasonable accommodation, the housing authority must extend the voucher term as required. The word must in that provision is mandatory language establishing a non-discretionary obligation. RNDC's conduct in refusing to execute the lease for Voucher No. 8151876 directly defeated the voucher term extension mechanism to which Mr. Edwards was entitled under this mandatory regulatory provision.

93. The refusal to accommodate denied Mr. Edwards and Nathan Edwards equal opportunity to use and enjoy their dwelling as guaranteed under 42 U.S.C. Section 3604(f)(3)(B) and caused the damages described throughout this complaint.

## COUNT IV

## Violation of the Racketeer Influenced and Corrupt Organizations Act: Conducting Enterprise Affairs Through a Pattern of Racketeering Activity 18 U.S.C. Section 1962(c) (Against All Defendants)

94. Mr. Edwards incorporates paragraphs 1 through 93 as if fully stated in this Count.

95. At all relevant times, RNDC, VOA-SELA, Mitchell, Hope Center, and Allen constituted an association-in-fact enterprise within the meaning of 18 U.S.C. Section 1961(4), engaged in and whose activities affected interstate commerce. *United States v. Turkette*, 452 U.S. 576, 583 (1981).

96. Each defendant conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. Section 1962(c), including predicate acts of wire fraud under 18 U.S.C. Section 1343, theft of government funds under 18 U.S.C. Section 641, obstruction and tampering under 18 U.S.C. Section 1512, and conspiracy against the United States under 18 U.S.C. Section 371, each as detailed in paragraphs 53 through 65 above. The predicate acts span October 2023 through April 4, 2026, satisfying the continuity requirements recognized in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

97. Mr. Edwards sustained injury to his business and property by reason of the defendants' violations of 18 U.S.C. Section 1962(c) within the meaning of

18 U.S.C. Section 1964(c). He is entitled to treble damages, costs, and all other relief authorized under 18 U.S.C. Section 1964(c).

## COUNT V

### Violation of the Racketeer Influenced and Corrupt Organizations Act: RICO Conspiracy 18 U.S.C. Section 1962(d) (Against All Defendants)

98. Mr. Edwards incorporates paragraphs 1 through 97 as if fully stated in this Count.

99. Each defendant agreed to and participated in the conspiracy to violate 18 U.S.C. Section 1962(c) in violation of 18 U.S.C. Section 1962(d). The agreement is established by the coordinated conduct of each defendant as documented throughout the evidentiary record and confirmed without inference by the CC: Hope Center Inc. designation on the face of Exhibit 43. (*see EX-43 pg. 1 ¶ 1*) The agreement need not be express. *United States v. Salinas*, 522 U.S. 52, 65 (1997).

100. Mr. Edwards sustained injury to his business and property by reason of the defendants' conspiracy within the meaning of 18 U.S.C. Section 1964(c) and is entitled to treble damages, costs, and all other relief authorized thereunder.

## COUNT VI

**Violation of Section 504 of the Rehabilitation Act of 1973 29 U.S.C. Section 794 (Against RNDC, VOA-SELA, and Hope Center)**

**Federal Law Has Prohibited for More Than Fifty Years Exactly What These Defendants Did to a Disabled Veteran in a Federally Funded Program.**

101. Mr. Edwards incorporates paragraphs 1 through 100 as if fully stated in this Count.

102. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794, provides that no otherwise qualified individual with a disability shall, solely by reason of that disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. RNDC and VOA-SELA operate The Groves at Miles Branch as a program or activity receiving Federal financial assistance through Housing Assistance Payments from HUD and LIHTC funding under 26 U.S.C. Section 42. Hope Center operates as a VA-funded SSVF program participant. Each is a covered entity under 29 U.S.C. Section 794.

103. Mr. Edwards is an otherwise qualified individual with a disability. He holds an active HUD-VASH voucher, meets all income and eligibility requirements for program participation, and has never committed any lease violation that would constitute lawful grounds for termination of his

tenancy. The manufactured default that RNDC and VOA-SELA fabricated is not a lease violation. It is the product of their scheme.

104. RNDC, VOA-SELA, and Hope Center excluded Mr. Edwards from the full benefits of the federal housing program, denied him reasonable accommodation, imposed discriminatory conditions on his program participation, and retaliated against him for asserting his rights, all solely by reason of his disability. *Alexander v. Choate*, 469 U.S. 287, 300-01 (1985). The defendants' refusal constitutes discrimination within the meaning of 29 U.S.C. Section 794.

## COUNT VII

## Civil Rights Conspiracy 42 U.S.C. Section 1985(3) (Against All Defendants)

105. Mr. Edwards incorporates paragraphs 1 through 104 as if fully stated in this Count.

106. Section 1985(3) prohibits conspiracies to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws. The elements of a Section 1985(3) claim are: a conspiracy; for the purpose of depriving a person or class of persons of equal protection or equal privileges; an overt act in furtherance of the conspiracy; and resulting injury.

### The CC Line on Exhibit 43 Is the Documentary Proof of the Section 1985(3) Agreement. It Is on the Face of the Document. It Requires No Inference.

107. The defendants formed a conspiracy with the purpose of depriving Mr. Edwards of the equal protection of the federal civil rights laws applicable to disabled persons in federally subsidized housing. The conspiracy is established by the coordinated conduct documented throughout the evidentiary record and confirmed by the CC: Hope Center Inc. designation on the face of the March 27, 2026 eviction notice. (*see EX-43 pg. 1 ¶ 1*) The overt acts in furtherance of the conspiracy are the fifteen payment blockings, the fabricated ledger entries, the three retaliatory eviction notices, and the coordinated suppression of mandatory federal reporting obligations. The injury is the fabricated arrearage, the destroyed Voucher No. 8151876, the damaged housing record, and the cancelled neurosurgery of Nathan Edwards. Mr. Edwards is entitled to all remedies available under 42 U.S.C. Section 1985(3).

## COUNT VIII

### Violation of the Louisiana Equal Housing Opportunity Act La. R.S. Section 51:2601 et seq. (Against All Defendants)

108. Mr. Edwards incorporates paragraphs 1 through 107 as if fully stated in this Count.

109. The Louisiana Equal Housing Opportunity Act, La. R.S. Section 51:2601 et seq., prohibits discrimination in the sale or rental of housing on the basis of disability and other protected characteristics. La. R.S. Section 51:2603 specifically prohibits discriminatory housing practices on the basis of handicap. La. R.S. Section 51:2607 makes it unlawful to retaliate or discriminate against any person because that person has exercised any right granted or protected by the Act.

110. The defendants' conduct, as described throughout this complaint, constitutes violations of La. R.S. Section 51:2601 et seq. in that they discriminated against Mr. Edwards and Nathan Edwards in the terms, conditions, and privileges of the rental of a dwelling on account of their disabilities; refused to make reasonable accommodations required by law; and retaliated against Mr. Edwards for exercising his rights under both federal and state fair housing law.

111. This Court has supplemental jurisdiction over the Louisiana Equal Housing Opportunity Act claim pursuant to 28 U.S.C. Section 1367, as the

state law claim is so related to the federal claims that it forms part of the

same case or controversy under Article III of the United States Constitution.

COUNT IX

Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law
La. R.S. Section 51:1401 et seq. (Against RNDC and VOA-SELA)

The Unauthorized Fee Extractions, the Fabricated Arrearage, and the Engineered
Late Charge Are Not Contract Disputes. They Are Unfair and Deceptive Trade
Practices Committed Against a Federally Protected Consumer.

112. Mr. Edwards incorporates paragraphs 1 through 111 as if fully stated in

this Count.

113. La. R.S. Section 51:1405 prohibits unfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or

commerce. La. R.S. Section 51:1409 provides a private right of action for

actual damages, treble damages for intentional violations, and attorney fees.

114. RNDC and VOA-SELA engaged in unfair and deceptive trade practices

within the meaning of La. R.S. Section 51:1405 through the following

documented conduct: the unauthorized extraction of WIPBKFEE charges of

$3.99 on every completed PayNearMe transaction without disclosure or

contractual basis (*see EX-1 pg. 3 through 36*); the retroactive insertion of

$1,370.10 in fabricated arrears into the resident ledger to manufacture a

false debt obligation (*see EX-9 pg. 1 through 4*); the imposition of a $75.00 engineered late fee following a payment blocking that RNDC itself caused through NEIGHBORWIPS configuration on April 4, 2026 (*see EX-36 pg. 1 ¶ 1*); and the transmission of fabricated balance figures through the PayNearMe electronic payment network on each of the fifteen blocking events to induce Mr. Edwards to submit payments against false account balances.

115. The defendants' violations of La. R.S. Section 51:1401 et seq. directly and proximately caused Mr. Edwards the economic damages attributable to unauthorized fee extractions, fabricated debt obligations, and the financial consequences of the payment obstruction scheme.

**COUNT X**

**Louisiana Retaliatory Eviction La. R.S. Section 9:3249 (Against RNDC, VOA-SELA, and Mitchell)**

116. Mr. Edwards incorporates paragraphs 1 through 115 as if fully stated in this Count.

117. La. R.S. Section 9:3249 prohibits a landlord from attempting to recover possession of a dwelling unit in retaliation because a tenant has exercised a

legal right, filed a good-faith complaint with a governmental agency, or participated in any proceeding under state or federal law.

118. Mr. Edwards exercised legal rights under the Fair Housing Act by requesting reasonable accommodation, submitting formal federal civil rights complaints, and filing pre-litigation demand letters. Each exercise of those rights was followed by a retaliatory adverse action within days: RNDC generated the January 11, 2026 fabricated default notice four days after receiving the January 7, 2026 demand letter; VOA-SELA served the February 27, 2026 eviction notice forty-four days after the January 14, 2026 formal complaints; and Mitchell served the March 27, 2026 third eviction notice twenty-five days after Mr. Edwards's Sworn Answer demolished every stated ground.

119. Each of the three retaliatory eviction notices constitutes an independent violation of La. R.S. Section 9:3249. Mr. Edwards is entitled to all remedies available under Louisiana law for retaliatory eviction, including actual damages, attorney fees, and such other relief as this Court finds appropriate.

## V. DAMAGES

The Defendants' Conduct Has Produced Economic, Consequential, Medical, and Non-Economic Harm Across Every Category for Which Federal and State Law Authorize Compensation, Punitive Sanction, and Mandatory Treble Recovery.

120. As a direct and proximate result of the defendants' violations of federal and state law, Mr. Edwards has sustained the following categories of damages, which he will prove at trial through the evidentiary record.

121. Actual and compensatory damages, including: all amounts fraudulently charged to Mr. Edwards's account without lawful basis, including the $242.10 fabricated charge inserted retroactively into the manipulated resident ledger (*see EX-9 pg. 2 ¶ 1*), the $1,370.10 tbs-susp fabricated arrears entry (*see EX-9 pg. 1 through 4*), the unauthorized WIPBKFEE extractions of $3.99 per completed transaction (*see EX-1 pg. 3 through 36*), and the engineered $75.00 late fee following the April 4, 2026 payment blocking; all rental credits and subsidy payments to which Mr. Edwards was entitled and that the defendants diverted through the $48.50 per-month discrepancy between the approved $462.50 Hope Center subsidy and the fraudulently applied $414.00 figure (*see EX-3 pg. 1 ¶ 1*); the full economic value of the federal housing benefit destroyed through RNDC's lease execution refusal causing expiration of Voucher No. 8151876 (*see EX-14 pg. 1 ¶ 1*); and all other quantifiable economic harm flowing from the defendants' course of conduct.

122. Consequential damages, including: the costs and harm resulting from housing instability imposed on the household by the defendants' manufactured default; the damage to Mr. Edwards's housing and administrative record attributable to the defendants' fabricated arrearage and retaliatory recertification proceedings; the economic harm to the household resulting from Nathan Edwards's cancelled neurosurgery and the continuing medical uncertainty caused by indefinite surgical postponement; and all other consequential losses caused by the defendants.

123. Punitive damages authorized under 42 U.S.C. Section 3613(c)(1), which provides for punitive damages in cases involving discriminatory housing practices committed with malice or with reckless indifference to federally protected rights. The defendants' fabrication of financial records, deliberate obstruction of forty-one rent payment attempts of which fifteen were blocked, physical alteration of a lease appointment document, destruction of a federal housing voucher through lease execution refusal, and coordinated retaliation against a disabled veteran following his reasonable accommodation request establish both malice and reckless indifference as a matter of the documentary record.

124. Treble damages mandatory under 18 U.S.C. Section 1964(c), which provides that any person injured in his business or property by reason of a violation of 18 U.S.C. Section 1962 shall recover threefold the damages he sustains.

125. Additional damages under La. R.S. Section 51:1409 for intentional violations of the Louisiana Unfair Trade Practices and Consumer Protection Law, including treble damages and attorney fees.

126. All costs of this litigation, and such other relief as this Court determines is just, equitable, and authorized by law.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eric David Edwards respectfully requests that this Court enter judgment in his favor and against the Defendants as follows:

A. A declaration that all Defendants violated 42 U.S.C. Section 3617 of the Fair Housing Act by retaliating against and interfering with Mr. Edwards in the exercise of his federally protected rights.

B. A declaration that Defendants RNDC, VOA-SELA, and Iinka Mitchell violated 42 U.S.C. Sections 3604(f)(1) and 3604(f)(2) of the Fair Housing Act by

discriminating against Mr. Edwards in the availability and terms and conditions of his federally subsidized tenancy because of his disability.

C. A declaration that Defendants RNDC, VOA-SELA, and Iinka Mitchell violated 42 U.S.C. Section 3604(f)(3)(B) of the Fair Housing Act by refusing to provide reasonable accommodation to Mr. Edwards and Nathan Edwards.

D. A declaration that all Defendants violated 18 U.S.C. Section 1962(c) and 18 U.S.C. Section 1962(d) of the Racketeer Influenced and Corrupt Organizations Act.

E. A declaration that Defendants RNDC, VOA-SELA, and Hope Center Inc. violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Section 794.

F. A declaration that all Defendants violated 42 U.S.C. Section 1985(3).

G. A declaration that all Defendants violated the Louisiana Equal Housing Opportunity Act, La. R.S. Section 51:2601 et seq.

H. A declaration that Defendants RNDC and VOA-SELA violated the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. Section 51:1401 et seq.

I. A declaration that Defendants RNDC, VOA-SELA, and Iinka Mitchell violated the Louisiana retaliatory eviction statute, La. R.S. Section 9:3249.

J. A permanent injunction restraining all Defendants and their agents, employees, officers, successors, and all persons acting in concert or participation with them from: taking any adverse action against Mr. Edwards's tenancy at The Groves at Miles Branch; interfering with HUD-VASH Voucher No. 3561555; blocking, refusing, reversing, or otherwise obstructing any rent payment tendered by or on behalf of Mr. Edwards; initiating or pursuing any eviction proceeding against Mr. Edwards based on the fabricated arrearage described in this complaint; and retaliating against Mr. Edwards in any form for filing this action or pursuing his rights in any forum.

K. An order requiring RNDC and VOA-SELA to correct and restate Mr. Edwards's resident ledger to reflect only lawful charges with documentary support under the governing lease and applicable regulations, removing all retroactively inserted entries identified in the comparison between Exhibit 3 and Exhibit 9.

L. An order requiring RNDC to preserve and produce the complete and unaltered Yardi Voyager Resident Ledger Audit Report and NEIGHBORWIPS audit log for Mr. Edwards's account, reflecting all user actions, account configuration changes, and transaction modifications from January 1, 2023 through the date of production.

M. Compensatory damages in an amount to be established at trial.

N. Punitive damages in an amount sufficient to punish the defendants' malicious and recklessly indifferent conduct and to deter future violations.

O. Treble damages pursuant to 18 U.S.C. Section 1964(c).

P. Treble damages and attorney fees pursuant to La. R.S. Section 51:1409 for intentional violations of the Louisiana Unfair Trade Practices and Consumer Protection Law.

Q. All costs of litigation.

R. Such other and further relief as this Court deems just, proper, and consistent with the full equitable authority vested in this Court.

Respectfully submitted,

Eric David Edwards, Plaintiff In Proper Person

136 Emily Diamond Way, Covington, Louisiana 70433

Telephone: (985) 635-7405

Email: eric.ed717@gmail.com

Date: April 16, 2026

**DEMAND FOR JURY TRIAL**

Plaintiff Eric David Edwards hereby demands a trial by jury on all claims so triable pursuant to Federal Rule of Civil Procedure 38(b).

## VERIFICATION

I declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 under the laws of the United States of America that the foregoing Verified Complaint is true and correct to the best of my knowledge, information, and belief, and that the documents referenced as exhibits are true and accurate copies of original records in my possession.

Eric David Edwards _Eric D. Edwards_ ,April 16, 2026

In Proper Person